**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BRITTON PARKWAY HOLDING, INC.,** | : | |
| 5550 Britton Parkway | : | |
| Hilliard, Ohio 43026, | : | Case No. _____ |
| | : | |
| Plaintiff, | : | |
| | : | Judge: _____ |
| v. | : | |
| | : | |
| **CITY OF HILLIARD, OHIO,** | : | Magistrate Judge: _____ |
| 3800 Municipal Way | : | |
| Hilliard, OH 43206, | : | |
| | : | **Demand for Jury Trial** |
| **HILLIARD, OHIO CITY COUNCIL,** | : | |
| 3800 Municipal Way | : | |
| Hilliard, OH 43206, | : | |
| | : | |
| and | : | |
| | : | |
| **MICHELLE CRANDALL, CITY** | : | |
| **MANAGER, CITY OF HILLIARD,** | : | |
| In her official capacity as City Manager for | : | |
| the City of Hillard, Ohio, | : | |
| 3800 Municipal Way | : | |
| Hilliard, OH 43206, | : | |
| | : | |
| Defendants. | : | |

## <u>COMPLAINT</u>

Plaintiff Britton Parkway Holding, Inc. ("BPH"), for its Complaint against defendants the City of Hilliard, Ohio, the Hilliard, Ohio City Council ("City Council") (together, "Hilliard" or the "City") and Michelle Crandall, City Manager, City of Hilliard, Ohio in her official capacity ("Ms. Crandall") (Ms. Crandall and Hilliard are collectively referred to herein as "Defendants") states the following:

## I.   <u>INTRODUCTION</u>

1.      BPH is before this Court to end the City of Hilliard's improper curtailment of

Islamic worship and unequal treatment of a neighborhood center intended to serve the needs of a local mosque's members and residents of the City of Hilliard.

2.     In what should have been a welcome and straightforward amendment to a development plan for a pre-existing planned unit development ("PUD"), City leaders ignored the City's Zoning Code and erected completely unfounded barriers to prohibit a neighborhood center that would provide much needed space for a growing mosque's members and other Hilliard residents to open businesses, have offices, educate their children – and, yes, to worship.  City leaders, however, improperly blocked the neighborhood center and prevented religious worship without any legitimate basis.

3.     BPH is an affiliate of the Noor Islamic Cultural Center and was created to serve and promote the needs of a growing Muslim community in Central Ohio by overseeing a neighborhood center in Hilliard that caters both to the mosque's members and the local community.

4.     The subject property hosts an enormous office building located at 5550 Britton Parkway in Hilliard, on the West side of I-270 (the "Property").  The office building, which was formerly occupied by BMW Financial Services, has been vacant for years following the precipitous drop in demand for large office buildings following the COVID-19 pandemic.  The Property is near the mosque.

5.     The City has recognized that there is no longer a market for massive office buildings, like the former BMW financial services office building.  In fact, City Council adopted a Community Plan that calls for the Property's office building to be re-developed as a "mixed-use node[] or neighborhood center[]" due to lack of demand for such a large office building.

6.     Consistent with City Council's plan for the Property, following a foreclosure

2

auction, BPH bought the Property to convert the long-vacant corporate office building into a vibrant, mixed-use neighborhood center. BPH seeks to dedicate the vast majority of the building's space to a broad array of uses that will create significant economic activity through new businesses and business incubators, corporate, professional, and medical office spaces, space for scientific research, a development and testing facility, professional training programs, a day care, a health and fitness center, and a school. A portion of the building will also be dedicated to worship, and the strong demand from the mosque's nearby members will support BPH's proposed uses and naturally revitalize the vacant building into the vibrant, mixed-use neighborhood center envisioned by the City. BPH's revitalization of the Property will inevitably lead to substantially more tax revenue than its current station as a large corporate office building that has been completely vacant for over two years without any prospect for a new single tenant seeking more than 200,000 square feet of office space.

7.      The Property is zoned as a PUD, within Subarea B4 of the City's Britton Central PUD. The Property's PUD development plan calls for the existing office building to be used only as a corporate office with limited ancillary support uses. BPH therefore applied through Application No. PZ-24-47 to revise the Property's development plan to reflect BPH's additional mix of uses for the planned neighborhood center (the "Application").

8.      Despite being consistent with the Community Plan and satisfying the Zoning Code's criteria (which should therefore have mandated approval of BPH's Application), City leadership utterly resisted BPH's efforts. City leaders, without ever consulting BPH, sought to impose unprecedented floor-by-floor restrictions on the Property's building and to limit BPH's right to assemble and worship in the building. Worse, the City's Planning and Zoning Commission (the "Commission") refused to even vote on BPH's actual request. The Commission instead

ignored its duties under the Zoning Code and voted to recommend a completely different proposal submitted by City staff. The staff's proposal was completely arbitrary, based on staff's whims rather than any provision in the Zoning Code. Staff's version was not structurally, mechanically, or logistically feasible as to the Property itself and was not economically viable either.

9.     Hilliard City Council thereafter conducted a public hearing on the Commission's recommendation to approve City staff's proposal. City hall overflowed with members of the mosque and supporters of BPH's plans. Council members nonetheless started the public hearing with the Lord's Prayer. Of the more than 100 people in attendance, City Manager Crandall is the only person who spoke against BPH's proposal, arguing that her City staff's version should be approved instead. In addition to supporters present at that hearing, there were over a thousand Hilliard residents who signed a petition in favor of BPH's Application, and expert witnesses likewise testified in support of BPH's plans and completely undermined Ms. Crandall's contentions.

10.     City Council ignored its duty under the Zoning Code and failed to review BPH's Application against the applicable review standards – which BPH's Application satisfied. City Council instead voted, without any lawful basis whatsoever, to deny BPH's Application and leave the status quo in place. This left BPH with a large, unusable office building that even City Council acknowledged must be redeveloped to be economically feasible.

11.     Defendants have articulated no rational reason or standard for denying the Application. Meanwhile, the City has recently approved development of data centers, research labs, and similar uses along the I-270 Corridor that generate far less tax revenue than BPH's uses will generate.

12.     In stark contrast to BPH's experience, Defendants have treated Christian uses and

4

institutions far differently. The City has appropriated approximately $1 million to the Hilliard Young Men's Christian Association ("YMCA") to help the YMCA build its own Christian community center; approved the Rock City Church's development in Hilliard without limiting its worship or areas to assemble; and approved the headquarters of Christian education organization at the former Aquatic Adventures building just off I-270.

13.     James Madison instructed that religious rights in the United States are unalienable:

> The Religion . . . of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men.

James Madison, Memorial and Remonstrance against Religious Assessments (1785).

14.     Just like its Christian counterparts, BPH seeks to use its private property free from illegitimate restriction and to have the ability to freely exercise the unalienable rights of local Muslims to assemble and worship at the Property free from government interference.

15.     In addition to violating the City's Zoning Code, Defendants' misconduct violated federal law and trampled upon BPH's rights protected by the U.S. and Ohio Constitutions. BPH has incurred and continues to incur substantial damages as a result. BPH therefore seeks monetary, injunctive, and declarative relief for Defendants' egregious violations of law.

## II.     PARTIES

16.     BPH is an Ohio non-profit corporation that is an affiliate of the American Islamic Waqf, Inc., a non-profit that owns and operates the Noor Islamic Cultural Center ("NICC") in Hilliard. BPH's principal place of business is located in Hilliard, Ohio.

17.     Hilliard is a chartered municipal corporation located in Franklin County, Ohio and subject to the laws of the State of Ohio.

18.     Ms. Crandall is the City Manager for Hilliard.  As City Manager, Ms. Crandall is responsible for overseeing all departments and divisions of Hilliard's municipal government and advising Hilliard City Council on legislation, City policy, and City finances.

19.     In addition to the foregoing parties, the Attorney General of the State of Ohio is being served with a copy of this Complaint pursuant to Ohio Revised Code § 2721.12(A).

## III.   JURISDICTION AND VENUE

20.     This action arises under the Constitution and the laws of the United States, including 42 U.S.C. § 1983.

21.     This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 2201.

22.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## IV.   FACTS COMMON TO ALL CLAIMS

### A.     HILLIARD'S PLANNED UNIT DEVELOPMENT APPROVAL PROCESS.

23.     A PUD is a type of development in which an area of land, usually under control of a single landowner, is to be developed with a variety of a mix of uses, such as commercial uses, business uses, religious uses, and educational uses, among others.

24.     Hilliard's Zoning Code explains that PUDs in Hilliard "permit and encourage more creative and innovative land development for the benefit of the community as a whole and **in furtherance of the vision and goals of the City of Hilliard Comprehensive Plan** . . . ." (Emphasis added.)  Zoning Code § 1117.01.

25.     The Zoning Code prescribes the uses that are permitted on land zoned as a PUD along with other development requirements governing the density and arrangement improvements that can be constructed.  *See* Zoning Code §§ 1117.03-04.

26.     To promote flexible development, there are no prohibited uses in a Hilliard PUD – all uses are permitted uses.  Zoning Code § 1117.03-Permitted Uses ("**Any** land use or combination of land uses may be considered for inclusion within a [PUD]." (Emphasis added)).

27.     Indeed, the Zoning Code's broad language permits all uses on land zoned as a PUD, whether religious, educational, or otherwise.  In fact, "[**c]hurches, public or private schools, public buildings, and recreational amenities**" are expressly and favorably contemplated to be permitted within a PUD.  (Emphasis added.)  Zoning Code § 1117.02(c) (exempting these specific uses from minimum lot size requirements for PUDs).[1]

28.     Generally, when land is rezoned from another zoning classification to a PUD, the property owner applies to rezone the land to the PUD zoning classification and submits a preliminary concept plan that outlines various components of the anticipated development, such as the uses contemplated, a conceptual layout of the buildings to be constructed, street and parking layouts, among other things.  *See* Zoning Code § 1117.05.

29.     City Council ultimately determines whether the City's Zoning Map should be amended to rezone the land from the prior zoning classification to the PUD zoning classification. *Id.*  City Council also considers whether the preliminary concept plan satisfies general standards prescribed by the Zoning Code.  *Id.*

---

[1] Under the "Minimum Site Size" requirement, "[a]ll non-residential" PUD types must developed on a site that is at least ten acres in size.  *Id.*  The Property is approximately 14.9 acres and therefore easily satisfies this requirement, regardless of whether it applies to BPH's uses.

30.     Following the rezoning and concept plan approval, the landowner has two years to submit a final development plan for that particular development.  Among other things, the final development plan addresses certain details, such as covenants governing the "use, design, maintenance, ownership and control of development and common areas" along with other matters pertaining to the construction of the development's improvements and infrastructure.  Zoning Code § 1117.05(c).

31.     Thereafter, a property owner may amend the PUD's development plan text, through – what should be – a straightforward plan change process set forth in the Zoning Code.  Zoning Code § 1117.08.  When a development plan amendment calls for a change of use, the Planning Commission initially reviews the amendment and makes a recommendation to City Council.  *Id.* City Council must then review the amendment pursuant to the review criteria set forth in the Zoning Code.  *See* Zoning Code § 1117.08(e).

32.     Following a public hearing, the Zoning Code requires the Planning and Zoning Commission to make a recommendation to Hilliard City Council on whether to approve the amendment and, as set forth in the Zoning Code, **"[t]he recommendation <u>shall</u> be based on the standards of [Zoning Code] Section 1117.06**."     (Emphasis added.)     Zoning Code § 1117.05(b)(2)(B) and (C).

33.     Section 1117.06 enumerates ten standards:

(a) *Purpose of PUD*.  The proposed development shall be consistent with the stated Purpose of this district, as found in Section 1117.01.

(b) *Qualifying Conditions*.  The proposed development shall satisfy each of the Qualifying Conditions, as stated in Section 1117.02.

(c) *Comprehensive Plan*.  The planned unit development shall be consistent with the recommended future land use patterns, goals and guiding principles contained in the City of Hilliard Comprehensive Plan.

8

(d) *Surrounding Uses*. The development shall be compatible with the existing and intended uses surrounding the subject property.

(e) *Natural Environment*. The design and layout of the planned development unit shall be harmonious with the natural character of the site and surrounding area and shall employ the best management practices to ensure their conservation.

(f) *Public Facilities and Services*. The proposed development shall not place undue burden on the capacity of public facilities and services such as, but not limited to, roads, fire, and police protection, water, sanitary sewer service and drainage.

(g) *Protects Health, Safety and Welfare*. The planned unit development shall not contain uses or conditions of use that may be injurious to the public health, safety or welfare.

(h) *Consistent with All Applicable Standards and Requirements*. The proposed development shall conform to all applicable requirements of this Code, unless specifically modified and approved, as authorized by Section 1117.04(b).

(i) *Final Development Plan*. The Final Development Plan is substantially consistent with the representations made and plans shown during the prior Concept Plan stage of approval.

(j) *Recognizable and Substantial Benefits*. Approval of the planned unit development will result in a recognizable and substantial benefit to the users of the project and to the community, which would not otherwise be feasible or achievable under conventional zoning districts.

34. Next, the Zoning Code requires City Council to hold a public hearing and specifies that "**Council shall** vote to approve, approve with supplementary conditions or not approve [the amendment] **based on** the standards of Section 1117.06." (Emphasis added.) Zoning Code § 1117.05(b)(3)(B) and (C).

35. Thus, if an amendment to a PUD's development text satisfies Section 1117.06's review standards, City Council has no discretion to deny it. *Id.*

9

**B.    THE RELEVANT HISTORY OF THE BMW FINANCIAL SERVICES BUILDING.**

36.    The Property consists of approximately 14.9 acres located at 5550 Britton Parkway in Hilliard, bearing parcel number 050-010214-00.  The Property is situated along the west side of I-270, just north of Hayden Run Road:



37.    In 2004, Hilliard rezoned over 280 acres of land, including the Property, to the PUD zoning classification.

38.    That same year, BMW Financial Services' ("BMW") landlord broke ground on the parcel and built a 226,000 square foot corporate office building that remains on the Property to this day.

39.    The Property was and also remains zoned within Hilliard's Subarea B4 of the Britton Central PUD.

40.    The Property's PUD development plan calls for the BMW building to be used by a single-user for office space uses, along with limited ancillary support uses that complemented the office building.

41.     In or around 2021, and due in part to post-COVID-19 pandemic market conditions, BMW began to consider downsizing its in-person office operations and moving to a smaller location.  Hilliard knew that BMW was considering relocation.

42.     In or around late 2022, BMW vacated the Property's office building.

43.     As a result of economic trends accelerated by the COVID-19 pandemic, the prior owner of the Property could not find a tenant to lease this massive office building.  The building has therefore sat vacant since BMW's departure.  Below is a photograph of the Property's exterior:



**C.     HILLIARD ENACTS THE COMMUNITY PLAN IN APRIL 2023.**

44.     Meanwhile, on April 24, 2023, via Resolution 23-R-28 (Amended), City Council enacted its Community Plan, also called the Comprehensive Plan.  The Resolution states that the Community Plan "**shall** serve as a guide for making policy and development decisions for the betterment of the City and its citizens."  (Emphasis added.)  (City of Hilliard 2023 Community Plan, relevant excerpts of which attached hereto as **Exhibit 1**, at ii.)

45.     The Community Plan "set[s] forth the long-range vision for physical development" in Hilliard.  (*Id.* at 1.)  It "indicate[s] how [Hilliard] will use land resources," "**serves as the**

**foundation for the city's . . . zoning ordinance**," and will be "implemented over time through many distinct decisions." (Emphasis added.) (*Id.*)

46. The Community Plan highlights five "focus areas" for "**specific design concepts and actions**": Old Hilliard, the Cemetery Road Corridor; the I-270 Corridor; the Retired Railroad Corridor; and the Big Darby Area. (Emphasis added.) (*Id.* at 2.)

47. According to the Community Plan, "[a]bout twenty percent of the city's land area is undeveloped" and "many of the developed non-residential areas have opportunities for infill and redevelopment." (*Id.* at 17.) "Developing this vacant and underutilized land more efficiently will maximize the use of the existing infrastructure and limit the consumption of undeveloped land beyond the city's western edge." (*Id.*)

48. This is why "[i]n recent years, the city has worked to . . . encourage redevelopment and infill development of underutilized areas along the I-270 corridor." (*Id.*)

49. Regarding the vacant corporate office buildings in the I-270 Corridor, which includes the Property, the Community Plan provides that "**[l]arger, older, single-use corporate office sites . . . may not be competitive for future tenants. The city should allow for creative options to reuse these sites and make them more viable**." (Emphasis added.) (*Id.* at 124.)

50. The Community Plan specifically calls out the Property and another site, prescribing that "[s]ince these sites, such as the **buildings formerly occupied by BMW financial** and Verizon are about a mile apart, they could **be transformed into distinct mixed-use nodes or neighborhood centers** that provide amenities to nearby workers and residents." (Emphasis added.) (*Id.* at 126.)

**D.     BPH OBTAINS THE PROPERTY.**

51. The NICC is a mosque that serves thousands of worshippers in Hilliard and the

12

surrounding area. The mosque has experienced rapid growth in its membership. The NICC therefore began looking for additional space to accommodate the increasing number of worshippers while providing much needed amenities to the Muslim community.

18.  The mosque is located at 5001 Wilcox Road and is in close proximity to the Property, situated just down the street:



52.  The interior of the Property contains three floors and a lower level. The floors resemble an airport terminal, featuring sunlit open spaces and numerous rooms of varying sizes. Photos of portions of the Property's interior office space appear below:





53.     Unable to find another tenant for the massive office building, the vacant Property fell into foreclosure and the owner auctioned the Property's mortgage.

54.     The NICC formed BPH on or about December 11, 2023, to serve as the real estate holding company for the Property.

55.     Following the Property's mortgage note auction, BPH acquired the Property via a deed in lieu of foreclosure on or about February 23, 2024.

56.     The funds that were used to pay for the Property came from donations by members of the Central Ohio Muslim community.

57.     Given that the entire Property was vacant, the mosque sought to use a small portion of the empty building for limited prayer services and for ancillary program including a weekend religious school.  The City, however, prohibited BPH from conducting prayer services at the Property and asked BPH to shut down the weekend religious school programming.

**E.      BPH's PLANS FOR THE PROPERTY PRESENT SUBSTANTIAL ECONOMIC BENEFITS.**

58.     Cognizant of the re-development prescribed by the Community Plan, BPH purchased the Property to transform the vacant office building into a dynamic neighborhood center featuring a creative mix of uses that will benefit the community, including uses that are complementary to the NICC.

59. BPH invested significant time and resources researching the Property's redevelopment and surveying community members to learn how BPH could use the Property to best suit the community's needs.

60. Based on its due diligence, the Property's existing zoning, and the re-development prescribed by the Community Plan, BPH's intends to re-use the massive structure for a mixture of uses by leasing space to third party tenants, including a STEM school, an event center/reception hall with food and beverage service, a daycare, a professional training center, administrative, business, corporate, and medical office space, business incubators, health and fitness facilities, retail outlets, as well as development and testing laboratories and facilities. BPH's uses are projected to substantial tax revenues that far exceed what the outdated office building generates in its current state.

61. Notably, BPH's plans also include space dedicated to public worship, not to exceed 10% of the building in a good faith attempt to enable the Property to generate significant economic activity, even though there is demand for more worship space from the mosque's members.

62. As Muslim business owners in Hilliard explained in a letter to City Council, BPH's proposed use of the Property "is expected to serve as a significant economic catalyst for the businesses within and around the revitalized facility." (Letter from Muslim-owned Business Owners, attached hereto as **Exhibit 2**, at 1.) The diverse range of uses at the Property "will drive consistent foot traffic," which will "directly benefit[] the surrounding commercial tenants" and result in "increased sales and customer engagement" for the Property and the nearby retail businesses. (*Id.*)

63.     In addition, BPH's intended uses "will foster a collaborative ecosystem where local businesses can actively participate in and sponsor community events . . . . allowing businesses to tap into a larger audience base" through cross-promotional activities.  (*Id.*)

64.     BPH's plans will likewise "attract new clientele to" the Property – such as families, professionals, and community groups – which will "enhanc[e] the overall value and reputation of the property" and cause a "ripple effect" of "increased activity and engagement" for neighboring businesses and Hilliard's local economy.  (*Id.*)

65.     At bottom, BPH's plans will convert the Property from a vacant office space to "a dynamic hub for both commerce and community organizations, solidifying its role as a key driver of economic growth in Hilliard."  (*Id.*)

66.     BPH's re-use of the Property's vacant office building therefore aligns perfectly with the mixed-use neighborhood center prescribed for the Property, all while generating substantial tax revenues for the City.

### F.     BPH Applies to Modify the Property's PUD Development Plan, but the City Departs From the Zoning Code and Erects Unprecedented and Unfounded Barriers to BPH's Use of the Property.

67.     Eager to begin the Property's economic revitalization and following significant due diligence, on July 2, 2024, BPH submitted its initial application to modify the Property's existing PUD development plan.  A true and accurate copy of the modified text submitted with the initial application is attached hereto as **Exhibit 3**.

68.     Representatives of BPH met with City Planner John Talentino on July 31 to discuss the initial application.  Mr. Talentino offered several suggested revisions to BPH's plans.

69.     Working in good faith, BPH sent Mr. Talentino a revised application with adjusted proposed development text on August 6 to address his suggestions.  A true and accurate copy of this updated development text is attached hereto as **Exhibit 4**.

70.     On the same date, the City issued a zoning certificate that allowed "general administrative office use only" at the Property.  A true and accurate copy of the zoning certificate is attached hereto as **Exhibit 5**.

71.     On August 8, the Commission heard BPH's Application.  However, rather than considering BPH's Application, Ms. Crandall and City staff unilaterally drafted their own proposed PUD text "from scratch" that was fundamentally different than BPH's Application.

72.     Defendants' "from scratch" re-write made substantial changes to BPH's proposed PUD text, including imposing an arbitrary limitation on religious worship at the Property.

73.     The Commission tabled the Application until its September 12 meeting under the auspice of providing City staff and BPH additional time to resolve the differences between their contrasting plans.

74.     At the Commission's request, and consistent with its prior efforts with Mr. Talentino, BPH pledged to work with the City in good faith to resolve the areas of disagreement.

75.     The next day, BPH's counsel emailed Mr. Talentino asking to meet and discuss a potential compromise.  Five days later, Mr. Talentino advised that "additional discussions are not going to change the staff position."

76.     After BPH's counsel responded to Mr. Talentino, the City's outside legal counsel directed that all future communications regarding the Application go through him.

77.     On September 5, the City's counsel informed BPH that it would be unilaterally imposing floor-by-floor restrictions to the revised PUD text, thereby restricting each floor of the

existing building to specified uses.

78.     Despite there being no legitimate basis for this restriction against BPH's use of the Property, the City's staff report for the Commission assigned floor-by-floor use restrictions and went even further to restrict other essential uses, including religious worship.

79.     There is no basis in applicable law for such restrictions.  There is likewise no precedent for restricting the use of a building on a floor-by-floor basis – no other property developer or PUD in Hilliard has been subject to such restrictions.  Moreover, this radical departure from BPH's Application serves no public, health, or safety concerns.

80.     While BPH attempted to continue negotiating with the City before the September 12 Commission hearing, the City's outside legal counsel informed BPH that negotiations were futile because "City staff will stay as they are."

81.     The Commission hearing moved forward on September 12.  At the hearing, BPH submitted another version of the revised PUD text in an attempt to address City staff's purported concerns that were feasible to address.

82.     BPH's efforts were dismissed by Ms. Crandall and City Staff.  They instead presented their staff report (with no input from BPH), that retained the fundamental alterations to BPH's proposed text, including the prohibition of worship uses and imposition of the unprecedented and completely arbitrary floor-by-floor use restrictions.

83.     The Commission unanimously approved City staff's proposed PUD text without so much as voting on BPH's amended Application.

84.     Contrary to the Zoning Code's express requirement, the Commission did not base its consideration of BPH's Application on the ten criteria set forth in Zoning Code § 1117.06.

85.     Following the Commission's hearing, City officials met with BPH's counsel once

more on October 4.  Ms. Crandall clarified to BPH beforehand that the meeting was "not intended to reopen discussions to alter the recommendations."  In line with Ms. Crandall's sentiment and without any legitimate legal basis, City officials arbitrarily demanded that at least 60% of the Property's building be used for uses that generate income tax revenue for the city, such as professional, office, and medical use – an arbitrary standard found nowhere in the Zoning Code, the Comprehensive Plan, nor previously applied to any other applicant.

86.    On November 11, BPH's counsel sent City Council a letter proposing a compromise that satisfied the 60% income tax-producing threshold and addressed many of the City's other issues.  For example, BPH maintained that religious worship and public and private schools remain permitted uses, but eliminated showroom uses and significantly reduced the square footage designated for school and retail use.  A true and accurate copy of counsel's letter is attached hereto as **Exhibit 6**.

### G. City Council Holds a Hearing During Which City Staff Provided the Only Opposition to BPH's Application.

87.    On November 12, City Council convened to consider the Commission's recommendation to approve City Staff's proposed PUD develop plan for the Property, which utterly ignored BPH's Application, and contained completely arbitrary and unprecedented restrictions against BPH's use of the Property.

88.    BPH attended the hearing, and in its continued effort to work in good faith with the City, sought approval of the Application, as amended by the changes set forth in BPH counsel's November 11 letter.

89.    At the hearing, BPH submitted a petition in support signed by over 4,400 people and over 150 letters in support of BPH's plans; 15 witnesses testified in favor of BPH's Application; and over 100 community members attended to offer their support.  In fact, the

Application was so popular that the hearing room could not accommodate the number of BPH's supporters – many attendees had to watch the hearing in the adjacent hallways via livestream.

90.     Not a single witness testified against BPH's Application during the public comment period.

91.     The lone opponent who spoke against BPH's Application was City Manager Crandall.  Ms. Crandall urged City Council to adopt City Staff's dictated restrictions, rather than BPH's.

92.     Ms. Crandall divined that the Property was economically viable as a premium office space, despite post-pandemic trends indicating just the opposite, and claimed that she was somehow trying to advance the Community Plan's goals – without pointing to any specific text in the Community Plan.

93.     Ms. Crandall pointed to the TruePointe development, as well as data center developments in the I-270 area, as models for successful development in Hilliard that BPH should replicate.  Ms. Crandall also asserted in conclusory fashion that "we know the market will support premium office building uses with good, high-paying jobs" and that "going beyond [City staff's] recommendations would further compromise the economic development of this site."

94.     Ms. Crandall never articulated a coherent standard for her review of BPH's Application.  She contended that the Property needed to maintain an economically viable use, but she never disclosed the expected tax revenue the Property needed to achieve during the hearing or application process in order to be acceptable – much less to any actual provision in the Zoning Code that imposed such a requirement.  In fact, despite being interested in this question at the hearing, neither Ms. Crandall, City staff, nor the City ever even asked BPH how much tax revenue its proposed mix of uses would generate.  Similarly, Ms. Crandall provided no rational justification

for restricting BPH's uses on a floor-by-floor basis, or for limiting religious worship at the Property – nor could she. Ms. Crandall did not cite or otherwise provide any support for the City's proposed restrictions that were created "from scratch." No study was performed. No community meetings were held. Ms. Crandall failed to identify any basis to demonstrate that a development within the existing site was even feasible, much less viable. Rather, the "from scratch" restrictions were completely arbitrary and have no connection to the public's health, safety, or welfare.

95. Moreover, Ms. Crandall and City Council did not and could not rebut the amount of significant tax revenues BPH's proposed uses would generate on the Property. As demonstrated to City Council, under the terms of the Community Plan, BPH's proposed uses exceed the tax generation projections of a previously approved development, the Tenby Development, discussed below. Defendants' inability to rebut BPH's tax generation projections, which exceeded the City's October 4 tax-revenue demand, encapsulates the arbitrary nature of Defendants' conduct toward BPH: every time BPH addressed and satisfied a contrived demand of the City, Defendants divined yet another baseless and unfounded obstacle to deny BPH's rights.

96. Ms. Crandall concluded her remarks by brazenly criticizing BPH for not contacting City Staff before purchasing the Property – as if BPH had any obligation to obtain Staff's permission – and speculated that BPH could have been directed to "alternative sites" for its intended uses somewhere other than a prominent property she referred to as being "the front door to Hilliard."

### H. THE REALITY IS THAT IT IS NOT ECONOMICALLY FEASIBLE TO MAINTAIN THE MASSIVE BUILDING ON THE PROPERTY AS A SINGLE CORPORATE OFFICE.

97. Witnesses with actual real estate expertise contradicted Ms. Crandall's speculation.

98. Robert "Skip" Weiler, Jr., of the Robert Weiler Company, who has almost 40 years of experience in the Central Ohio real estate market, explained that BPH's proposed conversion of

the Property would provide substantial economic benefits – and that its current use as an office space does not.

99.     Mr. Weiler noted that there are many vacant corporate office buildings along I-270 and that, due to their size, are not attracting tenants and therefore constitute economic deadweight. Mr. Weiler also warned that this office space downturn has not yet peaked. Once leases expire at other large corporate office buildings, be even more unleased office space will enter the market.

100.     Mr. Weiler also noted that a vibrant mixed use community center – exactly what BPH was proposing – will revitalize abandoned office spaces like the Property. The diversity of uses in the building, as Mr. Weiler explained, will attract more clientele to the Property, drive more customers to surrounding commercial properties, and thereby increase the City's tax revenue. In contrast, other developments that the City has recently approved provide comparatively less tax revenue and do not draw a base of customers like BPH's uses.

101.     Mr. Weiler also explained to City Council that restricting the Property's uses on a floor-by-floor basis severely limits the Property's economic upside. Rather, the uses within the building should be driven by the market and the needs of the building, not by government fiat. Further, such restrictions make no sense from an engineering, design, or economic perspective. (*See also* November 4, 2024 Letter by Mr. Weiler, attached hereto as **Exhibit 7** (explaining the economic benefits of BPH's intended uses of the Property and problems with Defendants' floor-by-floor restrictions).)

102.     Fadi Suleiman, a member of the NICC community and a real estate agent and developer with 20 years of experience, also testified in favor of the Application.

103.     First, he highlighted the City's favorable treatment of the Tenby Group's flex building project.

104. That project involved demolishing a 35,000 square foot office building, also located along I-270, that sat vacant for years, like the BPH property, to accommodate a new 130,000 square foot flex warehouse building. The City has agreed to provide the developer with a 15-year, 75% tax abatement in an effort to attract jobs at the payroll of $55,000 per job. Mr. Suleiman explained that the Property has better tax prospects from the private school alone, which would have payroll income of $40,000 per job without any income tax incentive.

105. In determining whether to approve Tenby's PUD final development plan, the City had to base its decision on the ten criteria in Section 1117.06. With minimal discussion and minimal conditions (none related to income tax), the City approved the Tenby PUD final development plan.

106. Second, Mr. Suleiman emphasized the reality from his experience that large corporate office spaces have become unmarketable in the post-pandemic environment, directly contrary to Ms. Crandall's unfounded assertions. Mr. Suleiman also presented materials that demonstrated that developers have successfully repurposed large vacant office spaces into mixed-use developments, including developments with educational uses.

107. Mr. Suleiman also discussed the vast amount of vacant office space in the Central Ohio marketplace, explaining that "if you take a mile radius of about 15 miles from Britton Parkway, there's 5.7 million square feet of office space . . . empty as of today."

108. Rather than promote the public welfare, restricting the Property to an office building for one tenant – or imposing other unfounded use restrictions – actually harm the public interest by kneecapping the Property's economic potential.

I. **THE APPLICATION FULLY COMPLIES WITH THE ZONING CODE'S REQUIREMENTS.**

109. As established during City Council's hearing, BPH's amended Application easily

satisfies Section 1117.06's review criteria:

- *Purpose of the PUD, § 1117.06(a)*:  BPH's proposed development – a mixed-use community center blessed by the Community Plan – satisfies several of the purposes set forth in Section 1117.01.  The project provides for flexibility in Property's redevelopment that will produce a better result for BPH, the NICC, Hilliard residents, and the City.  In addition, BPH's plans preserve the site's existing natural assets, such as trees, and adapt lands in a manner that meets market demand and preferences.  BPH's intended uses of the Property also encourages economical and suitable arrangements for buildings, streets, and site conditions by attracting a wide base of clientele to the area for a diverse array of uses.

- *Qualifying Conditions, § 1117.06(b)*: The original PUD satisfied the Qualifying Conditions when it was enacted, including location, purpose, size, and other conditions.  Moreover, BPH's Application is in closer compliance with the Qualifying Conditions than the existing PUD, as BPH intends to provide a complementary mix of uses at the Property and renovate an existing corporate office building into a viable asset instead of an unleasable liability.

- *Comprehensive Plan, § 1117.06(c)*: BPH's intended uses of the Property align perfectly with the Community Plan.  Under the Community Plan, the City specifically identified the Property as a burdensome, older, single-use corporate office that is not competitive in the post-pandemic market.  BPH's redevelopment of the Property's building into a mixed-use neighborhood center is exactly what the Community Plan prescribes for the Property.  (Ex. 1 at 124, 126.)

- *Surrounding Uses, § 1117.06(d)*: The redevelopment is compatible with the

existing and intended uses surrounding the Property because BPH's mix of uses complements the nearby residential uses by providing residents a place to work, obtain childcare, conduct large gatherings, and engage in religious and civic activities. Indeed, the Property was specifically chosen for its close proximity to the NICC, as BPH's uses will provide the mosque's members with necessary services and an additional place for religious activities. This flexible, creative development of an empty corporate office space aligns well with the Community Plan's vision for reusing and modernizing large office buildings in the I-270 Corridor to ensure that such buildings remain viable. (*Id.* at 126.) As Mr. Weiler explained, BPH's proposed uses and proximity to the NICC "will actually foster activity on the site and further align with what the City envisioned for this site in its comprehensive plan." (Ex. 7.)

- *Natural Environment, § 1117.06(e)*: BPH's redevelopment satisfies this subsection because its proposed uses will not alter any existing environmental conditions.

- *Public Facilities and Services, § 1117.06(f)*: There is no evidence that any of BPH's proposals will place an undue burden on any City facilities or services. BPH is not expanding the existing structure and, to date, none of the City's departments objected or raised concerns with BPH's Application.

- *Protects Health, Safety and Welfare, § 1117.06(g)*: All of the evidence indicates that BPH's proposed uses will only improve the public's health, safety, and welfare. Transforming a large vacant office building in the I-270 Corridor to a vibrant neighborhood center will benefit everyone, providing amenities to local residents as well as a synergistic ecosystem in which businesses can sponsor community

events and market their products or services.

- *Consistent with All Applicable Standards and Requirements, § 1117.06(h)*:  All of the Zoning Code's applicable requirements were satisfied.

- *Final Development Plan*, *§ 1117.06(i)*:  BPH's proposed PUD amendments have been consistent and do not alter the existing structure's exterior footprint.

- *Recognizable and Substantial Benefits, § 1117.06(j)*:  For all of the reasons discussed above, BPH's redevelopment will provide recognizable and substantial benefits to the community.  BPH intends to provide the Hilliard community STEM education, a community and worship center, as well as several new businesses and other retail outlets.  The redevelopment will convert the Property from economic deadweight to an economically viable neighborhood center, benefiting local businesses and substantially increasing the City's tax revenue.

**J.    THE CITY DENIES THE APPLICATION WITHOUT JUSTIFICATION.**

110.    City Council rejected City staff's revised PUD text by 4-3 vote.  And despite the overwhelming evidence presented by BPH, City Council rejected the BPH's Application, as amended by counsel's November 11 letter, by a unanimous vote.  City Council's votes left the existing text in place, requiring the entire building to be used for a large corporate office.

111.    City Council failed to identify any provision in Section 1117.06 – or any other provision in the Zoning Code – that BPH's Application did not satisfy.

112.    Rather, as Councilman Les Carrier noted during the hearing, no standard at all was being applied; City staff was instead applying *subjective* criteria and restrictions to BPH's Application.  For example, while City Staff may desire that the Property yield tax revenues, nothing in the Zoning Code, the Community Plan, or even City staff's comments described the

specific level of tax revenue that was necessary for approval. Councilman Carrier also questioned the legal basis for designating uses at the Property by floor, as nothing in the Zoning Code required such a restriction.

113. Councilman Carrier asked, "What is the standard – what is the standard for the BMW property? What should the revenue per acre or square foot be? Because it's not in anything I've read or anything we did in the [Community Plan]." Defendants never answered this question because, as Mr. Carrier concluded, "the standard is what staff says to the applicant."

114. Councilman Carrier ended by noting that City Council was "using unproclamated [*sic*], unarticulated financial conditions at an administrative level and it's unacceptable. It's adding factors that no one knows until they come see you [Ms. Crandall]."

115. The result of City Council's determination was to leave the Property's existing PUD development plan text unchanged – exactly the opposite result of what the Zoning Code required given that BPH's Application satisfied the applicable review standards.

116. The result was also completely arbitrary for the additional reason that, as the City Council previously acknowledged through adoption of the Community Plan, the Property's status quo as a massive office building is not economically viable.

117. If not for Defendants' actions, the Property could be developed into a mixed-use neighborhood center that benefits both the City, the neighboring property owners, and worshippers from the mosque. Defendants have decided to stunt the Property's redevelopment and set back the City's economy for irrational reasons.

**K. HILLIARD FAVORS AND SUPPORTS CHRISTIAN INSTITUTIONS AND USES.**

118. Defendants have done everything in their power to forestall BPH's proposed neighborhood center that will serve the mosque's Muslim members. The City's treatment of

Christian institutions and uses is far different.

119.    For example, on May 14, 2002, City Council passed Resolution 01-C-22, pursuant to which City Council appropriated a total of $600,000 to assist in the funding of a new YMCA community center.  A true and accurate copy of Resolution 01-C-22 is attached as **Exhibit 8**.

120.    A few months later, City Council then passed Resolution No. 02-C-31 (Amended), a true and accurate copy of which is attached as **Exhibit 9**.  Because "City Council strongly support[ed] the location of a YMCA in [the] community," City Council announced "an intended total contribution of $1,000,000 over five years" for "site preparation and construction of the new facility."  (Ex. 9.)

121.    In September and November of that year, City Council appropriated an additional $400,000 to the YMCA community center via Ordinances 02-49 and 03-50.  True and accurate copies of Ordinances 02-49 and 03-50 are attached as **Exhibits 10** and **11**, respectively.

122.    The Hilliard YMCA is part of the YMCA of Central Ohio, whose mission is to "serve the whole community through programs expressing Judeo-Christian principles that build a healthy spirit, mind and body." *Mission & Values*, YMCA OF CENTRAL OHIO, https://ymcacolumbus.org/about/mission-values (last visited April 13, 2025).

123.    The Hilliard YMCA is located at 4515 Cosgray Road in Hilliard.

124.    After the completion of its community center, the Hilliard YMCA held Christian religious services every Sunday for several years.

125.    Today, the Hilliard YMCA incorporates its Christian values through childcare services, education opportunities, fitness and wellness programs, and other amenities at its community center. *See generally Hilliard YMCA*, YMCA, ymca/org/locations/Hilliard-ymca (last visited April 13, 2025).

126.    In addition to funding Christian institutions, Hilliard has openly supported Chirstian worship uses in the Britton Parkway area.

127.    In 2015, Hilliard approved construction of the 51,600-square-foot Rock City church, which would be the foundation of a 14-acre campus dedicated to nondenominational Christian worship.  Kevin Corvo, *Rock City to lay first foundation on section of Anson Drive*, THE COLUMBUS DISPATCH, (Dec. 22, 2015, 11:01 p.m., updated on Dec. 23, 2015, 1:57 a.m.), https://www.dispatch.com/story/news/local/hilliard/2015/12/23/rock-city-to-lay-first/23073180007/ (last visited April 13, 2025).

128.    Hilliard's Rock City Church is one of several "Rock City locations across the state of Ohio" at which "thousands of people worship[] together."  *Our Mission: Make Heaven Full*, ROCK CITY CHURCH, https://rockcitychurch.tv/about/ (last visited April 13, 2025).

129.    Hilliard Rock City Church is located at 4311 Anson Drive in Hilliard, close to the Britton Parkway area and I-270 Corridor.

130.    Hilliard has also welcomed LifeWise Academy, a Christian-based organization that integrates Bible classes into school schedules, with open arms.  *About*, LIFEWISE ACADEMY, https://lifewise.org/about/ (last visited April 13, 2025).

131.    For example, in 2022, the Hilliard City Schools Board of Education voted to approve a religious release time-off policy.  Ashely Bornancin, *Hilliard parents express mixed feelings over approved religions policy*, 10WBNS (Sept. 18, 2022, 11:34 p.m., updated Sept. 18, 2022, 11:36 p.m.), https://www.10tv.com/article/news/local/hilliard-parents-express-mixed-feelings-over-religious-policy/530-9283575e-609c-436d-88a8-7337f121ab7a (last visited April 13, 2025).

132.    This policy enabled children to leave school to attend Christian-based courses

taught by LifeWise Academy during the school day. *Id.*

133.   In addition, LifeWise Academy recently purchased the former Aquatic Adventures Building in Hilliard, located near the I-270 Corridor at 3940 Lyman Dr. in Hilliard, as its new headquarters.  Cole Behrends, *Hilliard scuba facility to become HQ for LifeWise, Nonprofit teaches students about Bible*, Columbus Dispatch (April 30, 2024), https://www.dispatch.com/story/news/education/2024/04/29/former-hilliard-scuba-facility-to-be-new-lifewise-academy-headquarters-aquatic-adventures/73370576007/ (last visited April 13, 2025).

134.   Quite unlike their treatment of BPH, Defendants have only paved the way for LifeWise Academy's intended development.

135.   For example, in 2024, City has supported LifeWise Academy's development by granting a lot split, conditional site plan, and an easement, all without issue or insistence that LifeWise satisfy some random tax revenues requirement.

136.   In fact, at a December 9, 2024 meeting, City Council unanimously approved of the easement via consent agenda, that is, without debate.

137.   Rather than dictate restrictions on uses within each building, such as prohibiting Christian worship and other use limitations, Defendants willingly approved and supported the uses described above for the Christian applicants.

138.   Defendants' support and approval for these Christian uses stand in stark contrast to their treatment of BPH and the mosque's uses.

**L. THE CONSEQUENCES OF DEFENDANTS' IRRATIONAL AND DISCRIMINATORY DECISION.**

139.   The City had no rational reasons related to public health, safety, or welfare to deny BPH's amendments to the Property's PUD development plan.  The only justification provided by City staff was that BPH's uses would somehow generate less tax revenue than a corporate office

space – a use that has and will continue to deteriorate in the post-pandemic real estate market.

140.    Defendants also maintained that the Property can be leased to commercial tenants, but the evidence suggests that the opposite is true.  The prevalence of large, vacant corporate office buildings in Hilliard and throughout Central Ohio indicates that there is very little demand for these buildings in the current economic environment.  The Property will continue to remain vacant if it can be used only as an office and, by extension, generate virtually no tax revenue for the City.

141.    If not for Defendants' actions, the Property could be developed into a mixed-use neighborhood center that benefits both the City and the nearby property owners.  Rather than promote the public welfare, Defendants' restrictions actually *harm* the public interest by preventing the Property's redevelopment into commercially viable uses.

142.    This is exactly why the Community Plan that City Council adopted specifically calls for the redevelopment of the Property into a dynamic, mixed-use neighborhood center.

143.    Meanwhile, Section 1117.06 of the Zoning Code requires any change to the Property's PUD development plan to be consistent with the Community Plan.  BPH's Application was not only consistent with the Community Plan – BPH's intended uses align perfectly with the Community Plan's vision for the redevelopment of the I-270 Corridor.

144.    Defendants' conduct in this case is completely undermined by their actions in considering other approved developments in the I-270 Corridor.  Defendants have approved, without issue, numerous other developments that do not generate nearly as much tax revenue as BPH's intended uses.  For example, the City is actually abating the Tenby development's tax requirements for an extended period of time.

145.    The lack of any rational basis for denying BPH's Application reveals the true reason that Defendants have fought BPH's redevelopment at every step:  Defendants simply want to limit

Islamic worship in Hilliard.

146.     City Staff's revisions to BPH's Application further highlight their discriminatory intent.  Defendants maintain that they want viable economic uses in the I-270 Corridor, but designating uses on a floor-by-floor basis would only hamper the Property's economic potential.  In addition, Defendants can state no health, safety, or public welfare justification for prohibiting religious uses at the Property.

147.     Defendants have not sought to impose such onerous restrictions on other developers – only BPH – and have, in fact, encouraged Christian worship and education in Hilliard.

148.     Indeed, Defendants have no problem with Christian uses in Hilliard.  Rather, they actively support them.  The City has signed off on Christian uses at the Hilliard YMCA, Rock City Church, and the forthcoming Lifestyle Academy headquarters.  The City even appropriated $1 million in support of YMCA's community center, which for years held Christian religious services.  But when BPH proposed a *Muslim* community center in Hilliard, Defendants balked entirely by specifically excluding the use and insisting on its exclusion.

149.     BPH has tried in vain to work collaboratively with Defendants to redevelop the Property.

150.     Unfortunately, and to the City's own detriment, Defendants have failed to engage BPH in good faith and stifled the Property's development at every step of the way.

151.     Defendants have refused to conform to Zoning Code standards, have applied arbitrary and unprecedented standards instead, and have specifically prohibited Islamic worship services on the Property for no other reason than ill-will toward the Muslim community and a prejudice that their rights are inferior and can be subjugated.

152.     BPH comes to this Court seeking to right Defendants' wrongs.  Defendants are

targeting and discriminating against the Central Ohio Muslim community behind a thin veil of nonsensical and standardless justifications.

153.    Defendants' conduct has and will continue to cause BPH substantial monetary damages.

## V.    CLAIMS FOR RELIEF

### COUNT I – Violation of The Religious Land Use and Institutionalized Persons Act's ("RLUIPA") "Substantial Burdens" Provision, 42 U.S.C. § 2000cc(a)

154.    BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

155.    BPH is a religious institution and intended to use the Property for, in part, Islamic worship, prayer, and education, and other religious uses.

156.    Defendants have entirely prevented BPH from using the Property in furtherance of its religious mission and exercises by denying BPH's Application.

157.    Defendants' conduct has substantially burdened BPH's religious mission and exercises because there is not sufficient space at the NICC to accommodate its growing number of worshippers.

158.    Defendants' decisions to prevent BPH's religious exercises were not based on any rational reason, nor were they undertaken in furtherance of any compelling governmental interest.

159.    Even if Defendants could somehow identify a compelling interest that would warrant preventing religious exercise, Defendants' complete prohibition of religious worship at the Property was not the least restrictive means to further that interest.

160.    Defendants have, therefore, violated 42 U.S.C. § 2000cc(a)(1), causing BPH significant damages and harming BPH's free exercise of religion.

**COUNT II – Violation of RLUIPA's "Equal Terms" Provision,
42 U.S.C. § 2000cc(b)(1)**

161.    BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

162.    BPH, a religious institution, submitted the Application so that it could use the Property for, among other uses, religious exercise.

163.    Defendants erected unreasonable roadblocks to BPH's redevelopment of the Property, such as their unilateral prohibitions of worship, unilateral revisions that regulate use on a floor-by-floor basis, and eventually denying the Application without a legitimate basis to do so.

164.    At the same time, Defendants have permitted development of other nonreligious sites that generate far less tax revenue and other economic benefits than BPH's intended use of the Property, and have not severely restricted essential uses at those properties as Defendants did with BPH's.

165.    The Tenby development is one of several examples that belie the City's arbitrary economic standard used as a thinly-veiled excuse to deny BPH's Application and worship use of the Property.  There, the City determined that a large flex-use building satisfied all of the criteria in Section 1117.06.  And the City provided a 15-year, 75% tax abatement with a payroll of $55,000 per job.

166.    But here, Defendants have utterly ignored that the Property's creative mix of uses will generate significant tax revenue.  The school alone would have payroll income of $40,000 per job without any income tax incentive.  While Tenby and other developments have been subject to the same Section 1117.06 terms without issue, Defendants here ignored BPH's evidence and treated BPH disparately throughout the application process by prohibiting worship, seeking to implement arbitrary floor-by-floor restrictions, and requiring an unspecified and unknown level of

income tax revenue.

167.     In other words, Defendants treated BPH – a religious institution – on unequal terms as non-religious institutions.

168.     As a result of the Defendants' disparate treatment of BPH, BPH has and will continue to suffer significant damages.

### COUNT III – Violation of RLUIPA's "Nondiscrimination" Provision, 42 U.S.C. § 2000cc(b)(2)

169.     BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

170.     BPH, a religious institution, intended to redevelop the Property for, among other uses, Islamic worship, prayer, and other religious uses.

171.     Defendants have prevented BPH from engaging in these religious uses through their unilateral revisions to BPH's plans and denial of the Application.

172.     Defendants arbitrarily and capriciously denied the Application and continue to delay the Property's development as a place of worship and religious assembly, thereby preventing BPH from engaging in religious exercise at the Property.

173.     Defendants' conduct stands in stark contrast to their approval and support of the Hilliard YMCA, Rock City Church, and Lifewise Academy, prominent Christian organizations in Hilliard.

174.     Defendants favor Christian institutions and uses over Muslim institutions and uses, and Defendants denied the Application and targeted BPH in a manner that discriminates on the basis of religion.

175.     As a result of these violations of 42 U.S.C. § 2000cc(b)(2), BPH has and will continue to suffer significant monetary damages.

35

## COUNT IV – Regulatory Taking
## Under 42 U.S.C. § 1983 and the Ohio Constitution

176.    BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

177.    Under Hilliard's Zoning Code, "[a]ny land use or combination of land uses may be considered for inclusion with a [PUD]."  Zoning Code § 1117.03.

178.    Under the Property's current PUD development plan text, which permits only office uses with limited ancillary support uses, the Property cannot be put to any marketable or valuable uses due to the current economic environment.

179.    The City agrees with this conclusion.  The City's Community Plan explains that "[l]arge, older, single-use corporate office sites . . . may not be competitive for future tenants." (Ex. 1 at 124.)

180.    The City's Zoning Code requires that any amendment to the Property's PUD development plan text be consistent with the Community Plan.  Zoning Code § 1117.06.

181.    In light of these economic realities and consistent with the Community Plan, BPH sought to develop the Property into a mixed-use neighborhood center featuring numerous commercially-viable and permitted uses.

182.    Such a development would transform the Property from a vacant corporate structure into a vibrant locale with numerous opportunities and accommodations for Hilliard citizens in furtherance of the goals expressed in the Community Plan.  (*See id.* at 126.)

183.    BPH's proposed redevelopment has been unduly delayed by Defendants' unprecedented revisions to the Application during the review process and denial of the Application.

184.    Through these acts, Defendants have deprived the Property of any economic value

36

by ensuring that the Property will not be "competitive," (*id.* at 124), in attracting tenants.

185.    Defendants' conduct interferes with BPH's investment-backed expectations and results in severe detrimental impacts to BPH.

186.    Defendants have not provided BPH just compensation for its Property as required by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the Ohio Constitution.

187.    Defendants are acting as though it owns the Property, forcing BPH to use the Property for undesirable office space uses even though the City's Community Plan encourages conversion of vacant office space, like the Property, to economically viable, mixed-use spaces.

188.    Defendants must purchase the Property from BPH if Defendants want to impose their extralegal and subjective preferences on the Property.  Only then can Defendants develop the Property in the subjective manner Defendants desire.

189.    As a result, BPH has suffered and will continue to suffer the taking of its Property without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, Section 19 of the Ohio Constitution.

190.    Defendants are liable for just compensation for the period of time that they have and continue to take BPH's Property.  Moreover, Defendants' taking of the Property must be declared invalid and enjoined.

### COUNT V – Violation of Due Process – Void for Vagueness Under 42 U.S.C. § 1983 and the Ohio Constitution

191.    BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

192.    BPH's property and liberty interests are of a type protected by the Fourteenth

Amendment to the United States Constitution and the Ohio Constitution.

193. BPH possesses legitimate claims of entitlement and justifiable expectations in its property interests, including developing the Property in accordance with the Application.

194. Under Hilliard's Zoning Code, "[a]ny land use or combination of land uses may be considered for inclusion with a [PUD]." Zoning Code § 1117.03.

195. BPH has a right to use the Property for worship, schools, and other mixed uses.

196. BPH's Application satisfied all criteria in Section 1117.06 and is in accordance with the City's Community Plan.

197. As applied to BPH and its Property, Section 1117.06 is written in a manner that its terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard needed to receive approval from City Council.

198. As applied to BPH and its Property, the criteria in Section 1117.06 are so vague that it was applied to impermissibly delegate the Property's redevelopment to Defendants on an ad hoc and subjective basis.

199. Defendants' continued enforcement of the unconstitutionally vague Section 1117.06 has and will continue to cause deprivation of BPH's property and liberty interests protected under the United States Constitution and the Ohio Constitution, as well as significant monetary damages.

## COUNT VI – Violation of Equal Protection
## Under 42 U.S.C. § 1983 and the Ohio Constitution

200. BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

201. Defendants subjected BPH to unequal treatment of the law under color of law in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution and Article 1, Section 2 of the Ohio Constitution.

202.　Previously, Defendants have approved development applications that developers sought to develop under the Zoning Code.

203.　Additionally, the City has established a specific process for land use applications for all other similarly situated developers and property owners, including a process for proposed revisions to PUD text.

204.　Defendants have approved applications by similarly situated developers in the I-270 Corridor.

205.　BPH complied with all the requirements prescribed by the City's Zoning Code when it submitted the Application.

206.　Nevertheless, Defendants have blocked BPH's Application and unilaterally inserted their own subjective preferences for revised PUD text. Defendants have made clear that they will not negotiate with BPH or approve any application submitted by BPH. Defendants have therefore treated BPH differently from other similarly situated applicants.

207.　For example, the Application complies with all legitimate zoning standards set by the City. Defendants treated BPH differently from the other similarly situated applicants and (1) imposed irrational revisions to BPH's proposed PUD text, such as restricting uses on a floor-by-floor basis and prohibiting worship uses; and (2) denied the Application.

208.　In addition, unlike the Tenby Development, where Defendants approved of the PUD final development plan while also providing the developers with tax abatements, Defendants here have established an arbitrary and unknown tax revenue threshold in order to deny BPH's Application.

209.　Defendants had no rational basis for their unilateral revisions to BPH's proposed

PUD text or its arbitrary tax revenue requirement. None of Defendants' revisions relate to public health, safety, or welfare.

210. Likewise, Defendants had no rational reason for denying the Application. BPH's intended redevelopment of the Property fully complies with Zoning Code, comports with the objectives of the City's Community Plan, and promises substantial economic benefits for the City.

211. Further, BPH is a religious institution comprised of Muslim individuals.

212. BPH is also a religious institution that promotes and fosters the Islamic faith.

213. Defendants have treated BPH disparately compared to similarly-situated Christian institutions as shown by Defendants' support and approval of Christian developments such as the Hilliard YMCA, Rock City Church, and LifeWise Academy, among others.

214. Defendants have and continue to act with animus toward BPH and have no rational basis for the discriminatory treatment of BPH.

215. As a result, BPH has suffered and will continue to suffer from Defendants' unequal treatment under the law.

## COUNT VII – Violation of Substantive Due Process
## Under 42 U.S.C. § 1983 and the Ohio Constitution

216. BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

217. Defendants have deprived BPH of its property and liberty interests under color of law without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 1 and 16 of the Ohio Constitution.

218. Under Hilliard's Zoning Code, "[a]ny land use or combination of land uses may be

considered for inclusion within a [PUD]." Zoning Code § 1117.03.

219.    BPH has the right to develop its Property free from arbitrary restrictions imposed by biased officials.

220.    BPH's amended September 12 Application satisfies all criteria in Section 1117.06; City Council was therefore required to approve it.

221.    In addition, because City Council had no discretion to deny BPH's Application, BPH has a vested property interest in using the Property in line with its Application.

222.    Defendants have arbitrarily interfered with and prevented BPH from developing and using its Property in line with the Application.

223.    For example, Defendants' unilateral revisions to BPH's proposed development text, as well as the denial of the Application, bear no relation to public health, safety, or welfare.

224.    Defendants' actions are arbitrary, capricious, and unreasonable, and do not bear a substantial relationship to the City's Zoning Code, the Community Plan, or the circumstances of the case.

225.    As a result of Defendants' arbitrary and capricious actions, BPH has suffered and will continue to suffer the deprivation of its vested rights under the United States Constitution and the Ohio Constitution, along with substantial damages.

## COUNT VIII – Violation of Free Exercise of Religion
### Under 42 U.S.C. § 1983 and the Ohio Constitution

226.    BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

227.    Religious expression and worship are protected by the First Amendment of the United States Constitution and the Ohio Constitution.

228.    BPH intends to use the Property for Islamic worship, prayer, and other religious

practices.

229.    BPH's religious practices are sincere.

230.    Defendants have infringed upon BPH's right to free exercise of religion by preventing BPH from using the Property for BPH's intended religious uses through: (1) unilateral revisions to the Application that prohibit worship at the Property; and (2) denial of the Application.

231.    Defendants' conduct has and continues to substantially burden BPH's sincere religious practices in violation of BPH's right to free exercise of religion under the First Amendment of the United States Constitution and the Ohio Constitution.

232.    As a result, Defendants' denial of and infringement upon BPH's First Amendment rights has caused BPH significant damages and stifled BPH's right to free exercise of religion.

**COUNT IX – Violation of Freedom of Assembly
Under 42 U.S.C. § 1983 and the Ohio Constitution**

233.    BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

234.    The right to peacefully assemble with others is protected by the First Amendment of the United States Constitution and the Ohio Constitution.

235.    BPH intends to use the Property to lawfully and peacefully assemble with members of the Hilliard and Central Ohio Muslim communities.

236.    BPH's right to peacefully assemble is protected by the First Amendment of the United States Constitution and Ohio Constitution.

237.    Defendants prevented BPH from peacefully assembling through: (1) unilateral revisions to BPH's proposed development plan texts that restrict uses at the Property on a floor-

by-floor basis; and (2) denying the amended September 12 Application.

238.    Defendants' conduct has and continues to substantially burden BPH's right to peacefully assemble under the First Amendment of the United States Constitution and Ohio Constitution.

239.    As a result, Defendants' denial of and infringement upon BPH's First Amendment rights has caused BPH significant damages and stifled BPH's right to peaceful assembly.

## COUNT X – First Amendment Retaliation
## Under 42 U.S.C. § 1983 and the Ohio Constitution

240.    BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

241.    Through its Application, BPH petitioned the government to change the Property's development plan so that the Property could flourish and be used in a manner that benefits the community.

242.    BPH intended to use the Property for protected purposes such as peaceful assembly, religious practices and worship.

243.    In response to BPH's request to engage in such protected conduct, Defendants have systematically fought BPH's efforts to develop the Property contrary to Ohio law, the Ohio Constitution, and the United States Constitution for the purposes of grinding down and gradually destroying BPH's will to exercise its First Amendment rights.

244.    For example, Defendants have: (1) unilaterally imposed revisions to BPH's Application that deprive the Property of any commercial value and prohibit religious worship; and (2) denied BPH's amended September 12 Application.

245.    Defendants' retaliatory actions against BPH would in their totality chill or deter an ordinary person from exercising First Amendment rights to petition the City for land use approval

43

concerning the Property's development or for approval of the Application.

246. BPH's protected conduct was a substantial and/or motivating factor behind Defendants' adverse actions.

247. As a result of Defendants' retaliation, BPH has and will continue to suffer significant damages.

## COUNT XI – Declaratory Judgment

248. BPH incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

249. BPH's Application complied with the City's Community Plan and Zoning Code.

250. BPH's intended uses of the Property are constitutional, reasonable, substantially related to public health, safety, and welfare, and consistent with the City's Community Plan and Zoning Code.

251. Therefore, Defendants had no lawful basis to deny BPH's Application.

252. Denying BPH's Application was arbitrary, capricious, unreasonable, and prevents BPH from putting the Property to legitimate and economical uses consistent with the City's Community Plan and Zoning Code. Accordingly, BPH is entitled to a declaration that BPH's Application should have been approved and that its intended uses of the Property are constitutional, reasonable, substantially related to public, health, safety, welfare, and consistent with the City's Community Plan and Zoning Code.

## VI. PRAYER FOR RELIEF

WHEREFORE, in consideration of the foregoing, BPH seeks:

A) Compensatory damages in an amount to be determined by a jury;

B) A declaration stating that BPH's intended uses of the Property, as well as approving

BPH's Application, are constitutional, reasonable, and substantially related to the public health, safety, and welfare;

C) An injunction requiring Defendants to refrain from any action to prevent BPH from developing the Property consistent with the Application;

D) Pre- and post-judgment interest;

E) Attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

F) Any other declaratory, injunctive, or equitable relief this Court deems just and appropriate.

Respectfully submitted,

VORYS, SATER, SEYMOUR AND PEASE LLP

*/s/ Joseph R. Miller*
Joseph R. Miller (0068463), *Trial Attorney*
Christopher L. Ingram (0086325)
Maxwell H. King (0101498)
Garrett M. Anderson (0100121)
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6400
Fax: (614) 464-6400
jrmiller@vorys.com
clingram@vorys.com
mhking@vorys.com
gmanderson@vorys.com

and

PAINTER & ASSOCIATES LLC

*/s/ Nathan D. Painter*
Nathan D. Painter (0076274)
5029 Cemetery Rd.
Hilliard, OH 43206
Phone: (614) 319-3306
nathan@painterandassociates.com

*Counsel for Plaintiff*
*Britton Parkway Holding, Inc.*

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Britton Parkway Holding, Inc.

demands a trial by jury on all issues so triable.

*/s/ Joseph R. Miller*
Joseph R. Miller